UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID JOH, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>AMERICAN INCOME LIFE INSURANCE COMPANY,<br><br>    Defendant. | Case No. 18-cv-06364-TSH<br><br>**ORDER RE: MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Re: Dkt. No. 42 |

Before the Court is the Plaintiffs' Motion for Final Approval of Class Action Settlement and Attorneys' Fees, Costs, and Service Awards. ECF No. 42. Having reviewed the Settlement agreement and the parties' arguments and papers, the Court **DENIES** the Motion.

## I. BACKGROUND

### A. Factual and Procedural History

Plaintiffs are former insurance salesperson trainees or agents of American Life Insurance Company ("AIL"), who trained and worked at locations in California. Plaintiffs allege that as prospective AIL agents, trainees underwent training that lasted one week or more, during which they did not earn a commission and were not otherwise paid. Sec. Am. Compl. ("SAC") ¶ 18, ECF No. 30. They allege that AIG promised prospective agents salaried positions, but then hired them as commission-only employees, and failed to pay or reimburse them while they worked as sales agents. *Id.* ¶ 42. They allege that as trainees and agents they were not paid a minimum wage or overtime pay, did not receive proper meal and rest breaks, and had to pay their own work-related expenses. *Id.* ¶ 20. They also allege that agents were subject to "chargebacks," meaning that if they sold policies and those policies were later cancelled by the customer, AIL illegally collected back commissions from the agents earned wages. *Id.* ¶ 28.

Plaintiffs seek to represent a class of "[a]ll individuals who trained to become and/or worked as sales agents in California for Defendant during the last four years prior to the filing of the original Complaint." *Id.* ¶¶ 32-33. Plaintiffs assert the following claims: unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq.*; failure to pay California overtime compensation in violation of California Labor Code §§ 510 and 1094, and Industrial Welfare Commission ("IWC") Wage Order No. 4; failure to pay minimum wages in violation of California Labor Code §§ 1194 and 1197, and IWC Wage Order No. 4; failure to provide meal periods in violation of California Labor Code §§ 226.7 and 512, and IWC Wage Order No. 4; failure to provide rest periods in violation of California Labor Code § 226.7 and IWC Wage Order No. 4; waiting time penalties pursuant to California Labor Code §§ 202 and 203; failure to furnish accurate wage statements in violation of California Labor Code § 226 and IWC Wage Order No. 4; failure to reimburse expenses and illegal chargebacks in violation of California Labor Code §§ 221 and 2802, and IWC Wage Order No. 4; failure to pay wages/commissions in violation of California Labor Code §§ 221, 203 and 204; declaratory relief pursuant to 28 U.S.C. § 2201; and civil penalties pursuant to the California Private Attorneys General Act ("PAGA"), California Labor Code §§ 2698, *et seq.*

This action is the first-filed of a group of similar actions against AIL. Joh filed this case on September 12, 2018 in Contra Costa County Superior Court and AIL removed to this court. Joh filed on behalf of a class of current and former AIL agents who sold insurance in California, for California Labor Code violations, unfair business practices, and PAGA penalties. ECF No. 11. AIL moved to compel individual arbitration on November 21, 2018. ECF No. 12. Joh opposed, arguing that the arbitration agreement's PAGA waiver was unlawful and that the non-severability clause therefore rendered the entire section unenforceable. ECF No. 17.

On December 14, 2018, Hamilton filed a separate case against AIL in this district. *Hamilton v. American Income Life Ins. Co.*, Case No. 4:18CV7535. *Hamilton* named as plaintiffs both Hamilton and Smith, now Plaintiffs in this matter. They allege they were misclassified as independent contractors and deprived of compensation and benefits while participating in training and working as sales agents for AIL. Dkt. No. 14 ¶¶ 41(g), 88(h). That action also includes class

1 and representative allegations concerning unpaid training time and improper training practices of
2 prospective agents. Hamilton and Smith sought to represent a class of "[a]ll current and former
3 California-based AIL agents who began training on or after December 14, 2014." *Id.* ¶ 30.
4 Hamilton asserted claims against AIL for unfair business practices under California's Unfair
5 Competition Law ("UCL"); failure to pay overtime; failure to pay minimum wages; failure to
6 provide meal and rest periods; waiting time penalties; failure to furnish accurate wage statements;
7 failure to reimburse expenses; declaratory relief; and civil penalties under PAGA.

Separately Golz, one of the objectors to the proposed Settlement, filed a case against AIL in the Los Angeles County Superior Court on October 18, 2018. AIL removed that case to the U.S. District Court for the Central District of California on November 26, 2018. *Golz v. American Income Life Ins. Co.*, Case No. 2:18CV9879. Golz sought to represent a class of "[a]ll individuals employed by [AIL] who held job titles of Insurance Agents, Insurance Agent Trainee or likewise that were classified as 'Independent Contractors' during the Class Period." Dkt. No. 20, ¶ 73. She likewise brought claims of California meal and rest break violations; failure to pay California overtime compensation; failure to pay California minimum wage; failure to reimburse expenses in violation of the California Labor Code; and unfair competition in violation of the California Business and Professions Code.

After the parties in this matter had fully briefed AIL's Motion to Compel Arbitration, they agreed to attempt to resolve both *Joh* and *Hamilton* through mediation. Mot. For Final Settlement Approval ("Mot.") 3, ECF No. 42. On April 16, 2019, AIL and the plaintiffs in *Joh* and *Hamilton* participated in a full-day joint mediation with an experienced employment class action mediator, David Rotman. *Id.*; Decl. of Tindall in Supp. of Pl.'s Mot. ("Tindall Decl."), Ex. B, ECF No. 42-1; Supp. Decl. of Tindall in Supp. of Pl.'s Reply Mem. ("Supp. Tindall Decl.") ¶ 3, ECF No 50-1. The parties did not reach a resolution that day. *Id.* After the mediation ended, Rotman communicated a mediator's proposal to the parties, which included a total settlement amount. *Id.* Both sides accepted the proposal with conditions. *Id.*

On August 1, 2019, the Plaintiffs filed their Motion for Preliminary Approval of Class Action Settlement, ECF No. 39, which the Court granted on August 16, 2019, ECF No. 41. The

3

Court set a hearing on the motion for final approval for January 9, 2020. *Id.* ¶ 19. On November 5, 2019, Golz along with a number of other class members, filed an Objection to Final Settlement Approval. ECF No. 44.

**B.     The Settlement Agreement**

The key terms of the Settlement agreement ("SA"), Ex. A, ECF No. 42-2, are as follows:

Class Definition: The Settlement includes, "all individuals who trained to become and/or worked as sales agents in California for Defendant during the last four years prior to the filing of the original Complaint in *Joh* and whose training and/or work began before the date of preliminary approval of this settlement." SA 5, § II.C.

Settlement Benefits: AIL will pay a total settlement amount of $5,750,000. SA 7, §II.X. The SA contemplates amounts paid to class members, including Plaintiffs, after excluding: settlement fund costs and fees; administration costs of approximately $49,500, Decl. of Zachary Cooley of Settlement Adm'r KCC ("Cooley Decl.") ¶ 7, ECF No. 46; any incentive awards to Plaintiffs, up to $7,500 each ($22,500 total), SA 14, § III.I; any attorneys' fees and costs awarded, equal to not more than $1,437,500 in fees (approximately 25% of the value of the Settlement fund) plus litigation costs of $32,000, SA 14-15, § III.J; and a payment of $75,469 to the Labor Workforce Development Agency ("LWDA") pursuant to PAGA, SA 15, § III.K.  SA 9, § III.C.

Individual settlement payments will be calculated proportionately based on the number of workweeks a class member accumulated while training or working as an agent for AIL. Class members who never entered into an agent contract with AIL, those who never completed training but who underwent at least one day of training with AIL, will receive a rebuttable one-work training presumption, double weighted. SA 10, § III.F. All class members who entered into an agent contract with AIL after training during the class period will receive a rebuttable four-workweek training presumption, double weighted, plus the total number of weeks contracted as agents with AIL during the class period. *Id.* Class members who trained prior to the class period but worked as agents during the period will receive a share of the net settlement amount based on the number of weeks worked as agents during the class period. *Id.* Individual settlement amounts will average $590.52, and the maximum allocation is estimated to be $5,548.54. Cooley Decl. ¶ 7.

Release: All settlement class members will release:

> [A]ny and all rights, duties, obligations, claims, counterclaims, defenses, actions, causes of action or liabilities (including penalties of every kind or nature whatsoever), whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, punitive or compensatory as of the date of the Final Approval Order/Judgment: (a) that were brought by Plaintiffs in this Action; or (b) that reasonably arise out of the facts alleged in the Action. The Parties intend for the releases to be sufficiently broad enough to cover all claims brought on behalf of all individuals who trained to become and/or worked as sales agents California for Defendant during the last four years prior to the filing of the original complaint in *Joh*, including the claims asserted in the operative complaints in *Joh* and *Hamilton* as well as in *Golz v. American Income Life Insurance Co.*, 18-CV-09879 (C.D. Cal.) and *Putros v. American Life Insurance Co.*, Case No. 30-2019-01044772-CU-OE-CXC (Orange Cty. Sup. Ct.).[1]

SA 19, § III.R.

## II. ANALYSIS

### A. Final Settlement Approval

The Court may not grant final approval of the Settlement unless it determines that (1) the proposed class meets the requirements for certification under Federal Rule of Civil Procedure 23, and (2) the Settlement reached on behalf of the class is fair, reasonable, and adequate. "Especially in the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003); *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997) ("[S]pecifications of the rule--those designed to protect absentees by blocking unwarranted or overbroad class definitions-- demand undiluted, even heightened, attention in the settlement context.").

#### 1. Class Certification

Final approval of a class action settlement requires an assessment of whether the proposed class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b).

Under Rule 23(a), A class action is maintainable only if:

---

[1] The Court takes judicial notice of the fact that *Putros* was dismissed with prejudice on November 20, 2019 by the Orange County Superior Court. *Putros v. AIL*, Case No. 30-2019-01044772-CU-OE-CXC, Dkt. Nos. 98-99.

|   | (1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class. |

Fed. R. Civ. P. 23(a).

### a. Numerosity

Here, the putative class is sufficiently numerous, approximately 6,500 people. Joinder of all members would be impracticable.

### b. Questions of Law or Fact Common to the Class

There are questions of law and fact that are common to the class. A question is common where "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). A question is individual where the evidence to be presented varies from member to member. *Id.* The existence of "shared legal issues with divergent factual predicates is sufficient" to meet the commonality requirement. *Parra v. Bashas', Inc.*, 536 F.3d 975, 978 (9th Cir. 2008) (citation and internal quotations omitted). Here, Plaintiffs contend that the putative class was subject to the same overarching compensation policy with AIL, namely that trainees were not compensated, and agents were paid only in commissions and subject to chargebacks. The document addressing the relationship between agents and AIL, the agent contract, was apparently common across the class. The key issues in this case, including whether class members were properly classified as independent contractors, whether their training was compensable, and whether AIL's policies violated provisions of the California Labor Code, are common to the class. There are sufficiently common questions of fact and law.

### c. Typicality of Plaintiffs' Claims

The claims of Plaintiffs are typical of those of the class. "Under the rule's permissive

standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (citation and internal quotations omitted). Here, Plaintiffs allege injuries that are co-extensive with those of the absent class members. Two were trainees during the class period and all three were agents in California during the period. SAC ¶¶ 21-28. Their claims are based on their own training and working for AIL, and on the same conduct of AIL relevant to all class members.

### d. Whether Plaintiffs Will Fairly and Adequately Represent the Class

Additionally, Plaintiffs and their Counsel have shown they are able to fairly and adequately represent the interests of the class. Attorney Steven M. Tindall, co-Counsel of record for Plaintiffs, stated that Plaintiffs Hamilton and Smith both assisted Counsel with the investigation, filing, and litigation of the matter. Tindall Decl. ¶¶ 2, 22, ECF No. 42-1. Both Hamilton and Smith stayed apprised of the litigation, and Tindall opined that they both made decisions with the interests of the class in mind. *Id.* ¶ 22. Joh in a declaration stated that he has had numerous phone conversations with his attorneys as well as interviews, that he provided his attorneys with valuable information, and that he participated in all stages of litigation, including pre-filing discussions, concerning AIL's Motion to Compel Arbitration, discovery related issues, mediation, and settlement. Joh Decl. ¶ 8, ECF No. 42-8. He stated that he continually stayed informed of all aspects of the litigation, looked for and produced documents, assisted in settlement negotiations, made himself available to answers questions and review documents, and spent numerous hours communicating with other class members in relation to the claims he brought and notices received. *Id.* He estimated that he spent over 100 hours involved in the prosecution of this matter. *Id.* Finally, proposed class Counsel have decades of experience litigating employment class actions, including having successfully litigating many wage-and-hour class cases. Tindall Decl. ¶¶23-29, ECF No. 39-1; Decl. of Michael A. Gould in Supp. of Mot. for Preliminary Approval ("Gould Decl.") ¶¶ 6-9, ECF. No. 39-9. Plaintiffs would adequately represent the class. Accordingly, the prerequisites of Rule 23(a) have been met.

### e. Predominance of Questions of Law and Fact Common to Class

In addition to satisfying those prerequisites, parties seeking class certification must show that the action is maintainable under either Rule 23(b)(1), (2), or (3). *Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997). Plaintiffs rely on Rule 23(b)(3), which states that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In making a predominance inquiry, "more important questions apt to drive the resolution of the litigation are given more weight" than "individualized questions which are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). The key question is whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Id.* (citing *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009)).

Here, the core questions include whether AIL's practices of not paying trainees or giving them meal and rest breaks, and paying agents only commissions and not reimbursing them for expenses, are lawful, and if they are not, what relief class members are entitled to. Those questions dominate over individualized questions, the most pertinent being how many hours each class member accumulated in training or working for AIL. Additionally, a class action is a superior method for fairly and efficiently adjudicating this controversy. Thus, Rule 23(b)(3) is met.

Certification of the class for settlement purposes is appropriate.

### 2. Notice

Under Federal Rule of Civil Procedure 23(e), "claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998). The Court previously found the provisions for notice to the class set forth in the Settlement satisfy the requirements of due process and Fed. R. Civ. P. 23, and would provide the best notice practicable, including notice to all members who could be identified through

8

reasonable efforts. ECF No. 41. It approved the methods of providing notice, and the Claim Form, and directed KCC, the Settlement administrator, to proceed with providing notice. In accordance with the Court's preliminary approval, AIL provided KCC with the names, last known mailing and email addresses, and number of relevant workweeks for all class members. Decl. of Susanna Webb of Settlement Adm'r KCC ("Webb Decl.") ¶ 5, ECF No. 42-11. After removing 34 records for which it had no physical address, KCC mailed notice to 6,980 Class Members via U.S. mail. *Id*. As of November 12, 2019, KCC had received 670 Notice Packets returned by USPS with undeliverable addresses. Cooley Decl. ¶ 2. Through credit bureau and other public source databases, KCC performed address searches for those undeliverable packets, and was able to find updated addresses for 357 class members. *Id*. KCC also sent the notice via email for all class members for whom AIL had email addresses, 6,886 members in total. Webb Decl. ¶ 8. KCC has established a website devoted to the Settlement, which includes the class notice and other case-related documents. *Id*. ¶ 9. These efforts provided adequate notice to class members. *See Lundell v. Dell, Inc.*, 2006 WL 3507938, at *1 (N.D. Cal. Dec. 5, 2006) (notice disseminated via email, first class mail, and website constituted the "best practicable notice" and satisfied due process requirements).

### 3. Whether the Settlement if Fundamentally Fair, Adequate, and Reasonable

A court may only approve a settlement if it finds that it is "fair, reasonable, and adequate." Rule 23(e)(2). The Ninth Circuit has long instructed district courts to consider and balance multiple factors to assess whether a settlement is "fair, adequate, and free from collusion" under Rule 23(e). *Hanlon*, 150 F.3d at 1027. These factors are:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Id.* at 1026. "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) (citation omitted). Also, recent amendments to Rule 23 established a uniform set of factors courts should

consider when determining whether a settlement is fair, reasonable, and adequate:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). "The notes of the Advisory Committee explain that the enumerated, specific factors added to Rule 23(e)(2) are not intended to 'displace' any factors currently used by the courts, but instead aim to focus the court and attorneys on 'the core concerns of procedure and substance that should guide the decision whether to approve the proposal.'" *In re Extreme Networks, Inc. Sec. Litig.*, 2019 WL 3290770, at *6 (July 22, 2019) (quoting Advisory Committee Notes to 2018 Amendments, Fed. R. Civ. P. 23(e)(2)). "Accordingly, the Court applies the framework set forth in Rule 23 with guidance from the Ninth Circuit's precedent, bearing in mind the Advisory Committee's instruction not to let '[t]he sheer number of factors' distract the Court and parties from the 'central concerns' underlying Rule 23(e)(2)"—the fairness, reasonableness, and adequacy of the proposed settlement. *Extreme Networks*, 2019 WL 3290770, at *6 (again quoting the advisory notes). "[T]he underlying question remains this: Is the settlement fair?" *Partl v. Volkswagen, AG (In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig)*, 895 F.3d 597, 611 (9th Cir. 2018).

Additionally, "settlement approval that takes place prior to formal class certification requires a higher standard of fairness." *Hanlon*, 150 F.3d at 1026. "The dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the

settlement is not negotiated by a court-designated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e)." *Id.*; *Vargas v. Lott*, 787 Fed. Appx. 373, 374 (9th Cir. 2019) ("However, we hold district courts to a higher procedural standard when making that determination of substantive fairness. That procedural burden is stricter still when, as here, settlement is negotiated prior to class certification.") (citations and internal quotations omitted). Accordingly, the Court will proceed to analyze whether the Settlement is fair, adequate, and reasonable under the more exacting standard for fairness demanded.

### a. The Adequacy of Representation

As discussed above, Plaintiffs have all been actively involved in the litigation. Plaintiffs' Counsel have spent time working with Plaintiffs to develop the claims in the cases. Tindall Decl. ¶ 5, ECF No. 42-1, Gould Decl. ¶ 15. Their work included coordinating their opposition to AIL's Motion to Compel Arbitration, preparing for and submitting a mediation brief, preparing for and attending the mediation with an experienced class action mediator, negotiating the terms of the Settlement and drafting it and preparing exhibits thereto, communicating with KCC, and responding to class member questions regarding the settlement. Tindall Decl. ¶ 5. During litigation, Counsel contacted over three dozen proposed class members regarding their experiences with AIL, the potential claims in the case, and the potential damages of proposed class members. *Id.* ¶ 6.

Golz nevertheless objects that Plaintiffs and their counsel are inadequate representatives of the class. She suggests that they engaged in a "reverse auction" settlement. "A reverse auction is said to occur when 'the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant.'" *Negrete v. Allianz Life Ins. Co.*, 523 F.3d 1091, 1099 (9th Cir. 2008) (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002)). The crux of Golz's argument here is that she was in a better bargaining position and had a stronger case than Plaintiffs because she brought claims as a trainee and was not subject to the arbitration clause in agent contracts. She argues that AIL deliberately settled the class's claims with weaker plaintiffs who had the least leverage.

11

But this argument doesn't pass muster. For one thing, Golz's complaint did not assert a PAGA claim, as Plaintiffs did in *Joh*. For another, on April 2, 2019—two weeks before these Plaintiffs and AIL mediated—the late Honorable Manuel L. Real granted AIL's Motion to Dismiss in *Golz* and dismissed Golz's California Labor Code and FLSA claims, leaving only one of her claims remaining, her claim under California's Unfair Competition Law. Dkt. No. 34. The UCL allows for injunctive and restitutionary relief, but not monetary damages, and does not allow prevailing plaintiffs to recover attorneys' fees or costs. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1148 (2003) ("attorney fees and damages, including punitive damages, are not available under the UCL"). Moreover, there is no right to a jury trial for a plaintiff asserting wage-and-hour claims under a section 17200 cause of action. *Hodge v. Superior Court*, 145 Cal. App. 4th 278, 284-85 (2006). Accordingly, it's not accurate that Golz would have been in a better position to negotiate. AIL would have had no reason to reach a more favorable settlement in *Golz*, where Golz has only one claim and that claim doesn't permit damages. The Court does not find the parties partook in a reverse auction. To the contrary, because AIL succeeded in trimming *Golz* down to one claim, with no possibility of damages and no right to a jury trial, a reverse auction might have occurred had AIL settled in *Golz* instead.

### b. Arms-Length Negotiations

The second factor under Rule 23(e)(2) requires the Court to consider if the Settlement was negotiated at arm's length. Plaintiffs and AIL negotiated assisted by an experienced employment class action mediator. The involvement of a neutral mediator is evidence that settlement negotiations were conducted at arm's length. *See* Fed. R. Civ. P. 23(e)(2)(B), Advisory Committee Notes ("[T]he involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests."); *G.F. v. Contra Costa Cty.*, 2015 WL 4606078, at *13 (N.D. Cal. July 30, 2015) ("'[T]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.'") (quoting *Satchell v. Fed. Exp. Corp.*, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007)). The negotiations included a day-long mediation session, followed by a mediator's proposal which the parties accepted, with conditions. Plaintiffs' Counsel engaged in

additional calls with their mediator and additional negotiations with AIL's Counsel, and this ultimately led to an agreement in principle. Tindall Decl. ¶ 9. This is enough to demonstrate the parties engaged in arms-length negotiations.

Additionally, the Court does not find the fee arrangement in the SA is necessarily problematic. Golz argues that the Court should pay heightened attention to a risk of collusiveness because she argues the fee arrangement here was reached as part of the settlement of claims. Obj. 17. She cites to *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 308 (2005), a case in which the Third Circuit wrote "there exists a special danger of collusiveness when the attorney fees, ostensibly stemming from a separate agreement, were negotiated simultaneously with the settlement." But contrary to Golz's assertion, Plaintiffs' attorneys' fees here were not negotiated at the time of settlement but were discussed after the parties had agreed to a total settlement amount. Supp. Tindall Decl. ¶ 3, ECF No. 50-1. And courts in this Circuit have noted that attorney's fees provisions such as the one in the SA are proper. *E.g.*, *Hartless v. Clorox Co.*, 273 F.R.D. 630, 645 (S.D. Cal. 2011) ("The Court, however, recognizes that clear sailing agreements are routinely accepted in both the federal and California courts."); *Sandoval v. Roadlink USA Pac., Inc.,* 2011 WL 5443777, at *6 (C.D. Cal. Oct. 9, 2011) ("Agreements not to oppose an attorneys' fee request up to a certain amount, however, are proper. . . . Thus, Defendant's agreement not to oppose attorneys' fees of up to one third the settlement amount do not necessarily undermine the adequacy of representation for the purposes of preliminary certification for settlement approval.").

### c. The Adequacy of the Relief

The Settlement commits AIL to paying $5.75 million to settle this action. The settlement fund will be distributed to class members based on the number of workweeks each member has, and if Settlement funds remain after distribution, they will be re-distributed either pro rata to class members or to a cy pres beneficiary. In no event will any unclaimed funds revert to AIL.

Plaintiffs' counsel estimate that the maximum total liability for all claims is $31,273,212. Tindall Decl. ¶ 19, ECF No. 42-1. Accordingly, the Settlement amounts to approximately 18.4% of estimated total recovery. "It is well-settled law that a cash settlement amounting to only a

13

fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.)*, 213 F.3d 454, 459 (9th Cir. 2000) (citation omitted). Settlements amounts equal to or less than the amount here have been found adequate and fair by courts in this Circuit. *E.g.*, *id.* ('[T]he Settlement amount of almost $ 2 million was roughly one-sixth of the potential recovery, which, given the difficulties in proving the case, is fair and adequate."); *Avila v. Cold Spring Granite Co.*, 2018 WL 400315, at *6 (E.D. Cal. Jan. 12, 2018) ("Excluding the highly uncertain PAGA penalties, the net settlement amount is roughly 16% of the more realistic maximum recovery amount. That settlement amount is within the acceptable range, albeit at the low end."); *Jones v. Canon Bus. Sols., Inc.*, 2014 WL 12772083, at *8 (C.D. Cal. Sept. 2, 2014) (settlement amount representing a recovery of between 7 and 58% adequate); *Villegas v. J.P. Morgan Chase & Co.*, 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012) (settlement of approximately 15% found to be preliminarily fair).

Additionally, continued litigation in this matter would have been risky. The parties have an outstanding motion to compel arbitration, relevant to the claims of agents. Plaintiffs would have to prove that trainees qualified as employees, which would have bearing on whether it was legal for AIL to not pay them. Plaintiffs would also have to prove that AIL improperly classified its agents as independent contractors, and that agents were not subject to an "outside salesperson" exemption. The cost of litigating those issues would be costly. In light of the risks and costs of continue litigation, the Settlement amount of approximately 18.4% is adequate. *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. July 1, 2013) ("Although a larger award was theoretically possible, 'the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.'") (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998)).

### d. Equitable Treatment of Class Members

Golz asserts, however, that the settlement is flawed because "nobody amongst the settling parties had the trainees' interests at heart and this led to unfavorable terms for the trainees." Obj. to Final Settlement Approval ("Obj.") 13, ECF No. 44. She asserts that the trainees' claims were belatedly added for settlement purposes, and that the trainees' claims were not included in any of

14

the prior complaints in either of the settling Plaintiffs' cases. She asserts that the addition of the trainees' claims created conflicts of interest between the agents and the trainees. Plaintiffs counter that the complaint in *Joh* was amended, and the *Hamilton* plaintiffs and claims added, for judicial efficiency purposes. Reply ISO Mot. for Final Settlement Approval ("Reply") 9, ECF No. 50.

As a preliminary note, it is not accurate that neither of the two complaints in *Joh* or *Hamilton* contained claims related to training with AIL. Hamilton and Smith sought to represent a class of "[a]ll current and former California-based American Income agents who began training on or since December 14, 2014." They alleged that AIL "deliberately and systematically fails to pay its employees for all hours worked: its insurance salespeople, while training, do not receive minimum wage, overtime pay, reimburse for business expenses, or the meal and rest breaks they are entitled to under California law." Dkt. No. 14, ¶ 1. They asserted that they, "like class members, were not paid while training to become agents for American Income." *Id.* ¶ 34. They asserted that AIL failed to pay California overtime compensation, failed to pay minimum wages, failed to provide meal periods and failed to provide rest periods, and failed to furnish accurate wage statements as required by California law, as well as California waiting time penalties, which claims could be read as arising from training periods. Thus, the *Hamilton* complaint encompasses the same California Labor Code violations vis-à-vis trainees that were asserted in *Golz*.

That fact notwithstanding, the Court must still review the Settlement to ensure that it treats class members equitably relative to each other. Golz objects that trainees' claims make up a larger portion of the estimated total liability than what trainees could possibly obtain from the final Settlement amount, and that this is unfair. The Court finds merit in this objection.

Federal Rule of Civil Procedure 23(e)(2)(D) "calls attention to a concern that may apply to some class action settlements—inequitable treatment of some class members vis-a-vis others. Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23, Advisory Committee Notes.

Plaintiffs estimate that the largest chunk—roughly 50%--of the maximum total liability in

this case is for waiting-time penalties, approximately $15,742,320 of a total $31,273,212. Tindall Decl. ¶ 19, ECF No. 42-1. Plaintiffs determined that the number of agents and trainees who no longer work for AIL—those former employees who might be entitled to waiting-time penalties— is 5,963. *Id.* ¶ 18. Plaintiffs estimate that there were 1,486 trainees during the class period who did not become agents, *id.* ¶ 13, meaning that trainees made up just under 25% of the class members entitled to penalties for waiting time. Claims for waiting-time penalties accrue only once, one per former employee, meaning that 25% of the waiting-time penalties were attributable to trainees. Under the Settlement, however, claims are distributed pro rata based on the number of workweeks worked. As Golz points out, agent workweeks are far more numerous than trainee workweeks, 152,000 agent workweeks versus only 20,054 training weeks. *Id.* ¶¶ 13, 17. Yet the 1,486 trainees will receive a presumptive two workweeks for a total of 2,972. This means that trainees will presumptively receive only roughly 2% of the settlement value attributable to waiting-time claims, even though they account for 25% of those claims, which claims make up nearly 50% of the estimated value of maximum total liability in this case. Put another way, trainee waiting-time penalties make up approximately 12.6% of the estimated maximum total liability— as estimated by Plaintiffs—yet their share of the total Settlement fund would be diluted to approximately 2%—a disparity of 10%, or over $400,000 of the estimated $4,133,031 remaining of the Settlement amount for distribution. Cooley Decl. ¶ 7.

This disparity is compounded considering that "*Amchem* instructs [courts] to give heightened scrutiny to cases in which class members may have claims of different strength." *Hanlon*, 150 F.3d at 1020. Here, "Plaintiffs assert that the legal claims related to the training periods are comparatively easier to demonstrate and more valuable than the claims relating to the non-training employment period." Mot. 6. Plaintiffs concede that "while trainees would be required to prove that their training is compensable under the factors set out in *Portland Terminal* and related cases, sales agents additionally would be required to establish that they are not subject to the arbitration provision in their Agent Contracts and then also show that they were improperly classified as independent contractors under both caselaw and newly-passed legislation *and* that the 'outside salesperson' exemption does not apply to them." *Id.* (emphasis in original). Also,

16

Counsel for Plaintiffs stated:

> In designing a fair method for distributing settlement proceeds among Class Member, Plaintiffs' counsel was informed by their belief that *the legal claims related to the time Class Members were in training with AIL were comparatively easier to demonstrate and more valuable than claims related to the non-training period during which the Class Members worked as agents.* Plaintiffs' Counsel believed this to be the case in part because Class Members received *no* pay for their time spent in training, which Plaintiffs' Counsel believed to be a clear violation of minimum wage laws. In addition, Class Members received *no* wage statements for this time period, which Plaintiffs' Counsel also believed to be in violation of the California Labor Code (SECTION) 226. By contrast, Class Members who contracted with AIL as agents were compensated on a commission basis and received information from AIL concerning their pay. *Although Plaintiffs' Counsel believe there are Labor Code claims attributable to this post-training period as well, they are comparatively less strong than the claims related to the training period.* Although trainees would need to demonstrate that their training is not akin to vocational school, sales agents would need to show that they were misclassified as independent contractors and that the outside salesperson exemption under California law does not exempt them from Labor Code protections.

Tindall Decl. ECF 42-1, 3 (emphasis added); *see also* Gould Decl. ¶ 10 ("Liability is difficult to prove in this case. AIL presented case law supporting its position that sales agents are typically recognized as independent contractors in the industry."); Mot.12 ("Although Plaintiffs believe their class-wide claims would survive AIL's [motion to compel arbitration], AIL made several arguments which, if the Court were to agree, would effectively eradicate Plaintiffs' ability to bring their claims on a class-wide basis.").

Plaintiffs assert that the SA double weights trainees' workweeks to account for trainees' relatively stronger claims, but that double-weighting does not do enough to eliminate the disparity addressed above: even after, waiting-time claims attributable to non-agent trainees equal at least approximately 12% of total estimated liability, yet those trainees would come away from the Settlement with approximately 2% of the Settlement fund amount. And that approximation assumes that Plaintiffs could succeed in proving their claims that arose only after agents began working for AIL, which they admit were harder to prove and faced several additional burdens of proof. If the agent-only claims (the chargeback and unreimbursed expenses claims) failed, for example, trainee-only waiting-time claims alone made up approximately 15% of the total estimate

17

values of claims.  Additionally, Plaintiffs estimate that all meal and rest break claims, valued at $661,782, result from liability incurred during training periods, yet under the proposed arrangement, agents would rake in a hugely disproportionate portion of that value by virtue of having so many more workweeks, even though Plaintiffs would face the risk at trial of being unable to prove employee status, which failure would mean the vast majority of their workweeks would fall away.  In short, trainees' stronger claims make up a significantly larger percentage of estimated total liability than the percentage of the Settlement fund to which trainees would be entitled under the presumptions built into the Settlement agreement.

All settlement agreements must naturally work off the unknown.  But here Plaintiffs admit that trainees' claims are easier to prove and, importantly, are "more valuable," and yet agents will come out in the end with almost the entirety of the value of the settlement.  Such an arrangement is not equitable and fair.  Accordingly, the Court cannot approve the Settlement agreement and Plaintiffs motion must be denied.

**IT IS SO ORDERED.**

Dated: January 9, 2020

THOMAS S. HIXSON
United States Magistrate Judge

18